[Cite as *LeFever v. State*, 2013-Ohio-4606.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Virginia LeFever, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 12AP-1034 |
| v. | : | (C.P.C. No. 12CVH-01-973) |
| State of Ohio, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on October 17, 2013

*Cooper & Elliott, LLC, Rex H. Elliott, Charles H. Cooper, Jr., Bradley A. Strickling* and *Barton R. Keyes*, for appellant.

*Michael DeWine*, Attorney General, and *Debra Gorrell Wehrle*, for appellee.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Plaintiff-appellant, Virginia LeFever ("appellant"), appeals from a decision of the Franklin County Court of Common Pleas granting summary judgment in favor defendant-appellee, State of Ohio ("the State"), as to her complaint for wrongful imprisonment brought pursuant to R.C. 2743.48.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Appellant and William LeFever were getting a divorce. The final hearing was scheduled for September 27, 1988. Once the divorce was final, appellant planned to move to California with her children Alex, Sarah and Cory. William died on September 22, 1988, one week before the hearing.

{¶ 3} The Sixth Circuit Court of Appeals summarized the facts surrounding William's death and appellant's prosecution for aggravated murder in *LeFever v. Money*, 225 F.3d 659 (6th Cir.2000), as follows:

> On September 19, 1988, [appellant], who is a registered nurse, went to the office of her then-employer, Medical Personnel Pool. She told Anita Cullison, the staff coordinator there, that she was looking for a specific type of syringe for use on a Pool patient whom [appellant] was scheduled to see later that day.
>
> The next afternoon, [appellant] called Cullison * * * and * * * brought up a conversation they had several months before in which they discussed the fact that someone could be "eliminated" for $50 and a bus ticket. That same afternoon, William [LeFever] arrived at [appellant]'s home to pick up his tools. * * * At 8:30 that evening, [appellant] called Cullison, this time at home, and explained to her that she was not serious about eliminating anyone. [Appellant] also said that William had nothing to offer her except a life insurance policy, and that he would likely remove her as beneficiary after the divorce. William fell asleep on the family room couch and was still asleep when [appellant] went upstairs to bed at 10:30.
>
> Around midnight, Cory LeFever heard loud banging and then saw William running around naked and grabbing and talking to the trash. When Cory told [appellant] how William was acting, she told him that his dad would be all right. After hearing more banging, Cory went to [appellant] again, and this time she got up and went downstairs to check on William. When she and Cory went downstairs, they saw the bathroom in a state of disarray, and William had bruises and a big gash on his knee. [Appellant] then took William upstairs to her bedroom.
>
> At 6 a.m. that morning [appellant] noticed that her bottle of Elavil was missing. When she returned to her bedroom, she saw the bottle containing one-half tablet of Elavil on the floor near the nightstand. At that point, she surmised that William had taken 20, 100 mg tablets of Elavil. At 8:30 a.m., [appellant] called Cullison, again at home, and said that she let William in because he was making a scene, and that he had taken an overdose of pills. [Appellant] said she monitored his vitals and he would be all right, but she could not report to work that day. At 10:30 a.m. [appellant] called Cullison again, this time at the office, and asked her if she had called [appellant] at home, because she was keeping a "low profile."

That afternoon, between 2:15 and 2:30, [appellant] and her children went into the Pool office looking for a bandage. William was left behind at her home.

Later that same afternoon, [appellant] telephoned Vernon Breese, William's best friend, and said that William was "pretty bad off," and that he was bruised and beaten up from bumping around the house. He told her to call the emergency squad. She said she did not want to do that, because she did not want people to know about the overdose, especially because of their impending divorce. When he arrived at [appellant]'s home, Breese found William lying in a supine position on the bathroom floor with pale gray skin, bruises, and a bad, unbandaged cut below his knee. As he began wiping William down in an effort to revive him, he told [appellant] to call the emergency squad. She offered to call a doctor she knew instead.

[Appellant] told Breese that Dr. Wesley Filipow told her that "it would pass," to wait it out, and that, if he did not get better, to then bring him to the hospital. At that point, Breese insisted that she call the emergency squad, which she did.

At the hospital William * * * said that his bruises were from [appellant] who would "beat the shit out of him" whenever he passed out. William died that morning at 11:37.

Pursuant to a warrant, the police later found the following items while searching [appellant]'s bags of garbage: a can of poison peanuts used to kill rodents; a 35 mm film canister with a residue consistent with the strychnine-laced peanuts; a can of Forces Ro-Dex used to kill pocket gophers, which contains a strychnine base; a pink dye consistent with that used in Ro-Dex; an empty bottle of Terro ant killer, which contains an arsenic base; the charred remains of a burnt fumigant stick called "Smoke 'Ems," a mole killer that contains sulfuric dioxide; household deodorizer; syringes; and hypodermic needles.

In trying to determine the cause of William's death, medical examiners for the county found the following poisons in William's system: amitriptyline; its metabolite, nortriptyline; strychnine; arsenic; and sulfate.

[T]he chief toxicologist for the county coroner's office found pieces of cracked corn, peanuts, seeds, and dye in William's

> body that were identical to that found in the Ro-Dex rodent bait and the poison peanuts located in [appellant]'s garbage. * * * In William's blood he found 16 times the amount of sulphate that would normally be present; he said the amount was consistent with an individual breathing in the fumes from a sulfur candle. After considering all of this evidence, the examiners opined that William died from acute amitriptyline and nortriptyline poisoning that was administered intramuscularly and rectally.

(Footnotes omitted.)

{¶ 4} On November 30, 1988, the Licking County Grand Jury indicted appellant on one count of aggravated murder in connection with the death of her husband. Following a bench trial, appellant was convicted of aggravated murder and sentenced to life in prison. The court of appeals affirmed the conviction in *State v. LeFever,* 5th Dist. No. CA-3535 (Nov. 18, 1991).

{¶ 5} In 2010, after appellant had served 22 years of a life sentence, the sentencing court granted appellant's motion for a new trial due to the fact that the State's toxicologist had lied about his qualifications.[1] The Licking County Prosecutor, Ken Oswalt, subsequently dismissed the indictment "without prejudice."

{¶ 6} Thereafter, appellant filed a complaint against the State seeking a declaration that she was a wrongfully imprisoned individual pursuant to R.C. 2743.48. In her complaint, appellant alleges that she did not kill her husband, and that a crime "was not committed by any person because it was, in fact, a suicide, and not a murder." (Complaint, ¶ 8.)

{¶ 7} On November 22, 2012, the trial court concluded that appellant failed to produce evidence that no criminal proceeding can or will be brought against her for any act associated with her conviction, and granted summary judgment in favor of the State.

{¶ 8} Appellant timely appealed to this court from the judgment of the Franklin County Court of Common Pleas and assigns the following assignments of error:

> 1. The trial court erred when it granted summary judgment in favor of the State of Ohio and found there was no genuine issue of material fact as to whether a criminal proceeding "can be brought or will be brought" against Virginia LeFever.

---

[1] *State v. LeFever,* Licking C.P. No. 1988-CR-17117 (Nov. 22, 2010) (Judgment entry granting new trial).

2. The trial court abused its discretion when it impliedly denied Ms. LeFever's motion for leave to file a motion for partial summary judgment by terminating the case without ruling on the motion for leave.

## II. STANDARD OF REVIEW

{¶ 9} Appellate review of a summary judgment motion is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 10} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 11} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.* If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a

genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Id.*

## III. LEGAL ANALYSIS

### A. Trial Court Ruling

{¶ 12} In order to be declared a wrongfully imprisoned individual, a claimant must satisfy, by a preponderance of the evidence, all five criteria set forth in R.C. 2743.48(A). *Dunbar v. State,* 136 Ohio St.3d 181, 2013-Ohio-2163; *Gover v. State,* 67 Ohio St.3d 93, 95 (1993).

{¶ 13} R.C. 2743.48(A) provides, in relevant part, as follows:

> As used in this section and section 2743.49 of the Revised Code, a "wrongfully imprisoned individual" means an individual who satisfies each of the following:
>
> * * * *
>
> (4) The individual's conviction was vacated, dismissed, or reversed on appeal, the prosecuting attorney in the case cannot or will not seek any further appeal of right or upon leave of court, *and no criminal proceeding is pending, can be brought, or will be brought by any prosecuting attorney, city director of law, village solicitor, or other chief legal officer of a municipal corporation against the individual for any act associated with that conviction.*
>
> (5) Subsequent to sentencing and during or subsequent to imprisonment, an error in procedure resulted in the individual's release, or it was determined by the court of common pleas in the county where the underlying criminal action was initiated that the charged offense, including all lesser-included offenses, either was not committed by the individual or was not committed by any person.

(Emphasis added.)

{¶ 14} The trial court granted summary judgment for the State because appellant did not present any evidence in satisfaction of R.C. 2743.48(A)(4). More particularly, the trial court determined that appellant "has not presented any evidence showing that she could not be retried." (Trial Court Decision, 10.)

{¶ 15} The trial court explained that "[t]he evidence presented shows criminal proceedings against Ms. LeFever may be brought by the prosecuting authority for an act associated with her earlier murder conviction. Plaintiff has not offered evidence to the contrary on that issue i.e., the statute has run, it is barred by *res judicata*, etc." (Emphasis sic.) (Trial Court Decision, 11.) In other words, the trial court placed the burden on appellant to produce evidence that subsequent criminal proceedings were either not possible upon the evidence or that such proceedings were legally barred.

**B.  State's Evidence in Support of Summary Judgment**

{¶ 16} The State presented evidence establishing that the prosecutor had not abandoned his effort to prosecute appellant for the death of her husband and that such a prosecution was both factually sustainable and legally permissible following reversal. The State argues that the evidence conclusively establishes that further criminal proceedings can or will be brought against appellant for her husband's death. We agree.

{¶ 17} In a press release dated April 21, 2011, Licking County Prosecutor, Ken Oswalt, made the following comments about the case against appellant:

> After an exhaustive analysis of that evidence – including exploring the limitations on conducting new scientific testing today on what few biological samples remain after over 20 years – I have come to the professional judgment that, as it currently stands, I am not in a position to successfully retry Mrs. LeFever on the charge of Aggravated Murder with any likely prospect of meeting the State's burden of proving her guilt beyond a reasonable doubt.
>
> * * *
>
> Although the granting of the motion to dismiss terminates the current proceedings, it also does one other significant thing. Because the dismissal was done "without prejudice" it allows for the re-filing of charges in the future in the event that new *admissible* evidence were to be discovered; and/or in the event that scientific advancements in the future were to allow for the testing of currently available biological samples by a new *qualified* toxicologist, that would also include reliable opinions not only as to the presence and quantity of any poisons in Mr. LeFever's body at the time of his death; but also reliable expert opinions regarding the timing, mode and/or manner of administration of those poisons. As reported to me, these things cannot be done with the current

> state of today's scientific know-how. As that may change in the coming years, the possibility does exist that re-filing charges in this matter could legally occur at some point in the future.

(Press Release, 1-2.)

{¶ 18} In his deposition testimony in this matter, Oswalt explained that he still believed that he had at least "a fair chance of getting [appellant] convicted of at least aggravated attempted murder." (Tr. 27.) With regard to the statute of limitations, Oswalt testified as follows:

> Q. [W]hat is, then, the statute of limitations on an attempted aggravated murder charge?
>
> A. It is generally six years. However, statute of limitations are tolled during any period of time an indictment is pending, prosecution is pending. So that six-year statute of limitations was tolled when she was indicted in November of 2008 - - excuse me, 1988 and it was tolled up until the date I dismissed that indictment.

(Tr. 47.)

{¶ 19} Oswalt related that there is no statute of limitations for aggravated murder. (Tr. 50.) However, he acknowledged that if the science of toxicology does not advance far enough in the next few years to permit a prosecution for aggravated murder, he will have to make a decision whether to proceed with a charge of attempted aggravated murder. (Tr. 47-50.) He conceded that res judicata would bar him from subsequently prosecuting appellant for aggravated murder if he first went forward with a charge of attempted aggravated murder. (Tr. 48-49.)

{¶ 20} According to Oswalt, both Corey and Sarah LeFever have expressed to him that they are willing to give testimony which would implicate appellant in an attempt to poison her husband with a fumigant known as "Smoke 'Ems." Oswalt related that one other witness has come forward since the reversal of appellant's conviction to offer testimony which corroborates the facts set forth by Corey and Sarah. He refused, however, to disclose details regarding the new evidence against appellant due to the

existence of a privilege.[2] According to Oswalt, his assessment of the chances of a conviction for attempted aggravated murder are based upon the evidence he has received since appellant's release, the testimonial evidence presented in the first trial, and the remaining physical evidence uncovered in the search of appellant's home.

### C. Meaning of R.C. 2743.48(A)(4)

{¶ 21} In her first assignment of error, appellant argues that that trial court's interpretation of R.C. 2743.48(A)(4) is contrary to the intent of the General Assembly in enacting the wrongful imprisonment statute. We disagree.

{¶ 22} Appellant's first contention is that the trial court misinterpreted the phrase "no criminal proceeding * * * can be brought, or will be brought." R.C. 2743.48(A)(4). Appellant notes that the statute is remedial in nature and that the General Assembly did not intend to deny recovery to the claimant simply because of the mere possibility of future criminal proceedings. Rather, she believes that the General Assembly intended the language as a bar to recovery only where further criminal proceedings will, more likely than not, result in a conviction.

{¶ 23} " ' "[W]here the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions therefrom." ' " *Terry v. Sperry,* 130 Ohio St.3d 125, 2011-Ohio-3364, ¶ 25, quoting *Sherwin-Williams Co. v. Dayton Freight Lines, Inc.,* 112 Ohio St.3d 52, 2006-Ohio-6498, ¶ 14, quoting *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, ¶ 14. In *Dunbar*, the disputed issue was whether a claimant satisfied R.C. 2743.48(A)(2), which requires claimant to prove that he has not pleaded guilty to the offense for which he was convicted. The court of appeals had reversed Dunbar's first conviction because the trial court failed to advise him of his rights and did not give him the opportunity to withdraw his guilty plea. *Id.* at ¶ 3. Dunbar's second conviction was overturned due to insufficient evidence. *Id.* at ¶ 4. Dunbar subsequently filed a complaint seeking a declaration that he was a wrongfully imprisoned individual. *Id.* at ¶ 4. The trial court granted summary judgment for Dunbar reasoning that his prior

---

[2] Attorney "opinion work-product" involves the attorney's mental impressions, conclusions, opinions or legal theories, and such work product can be discovered in a civil action only in very rare and extraordinary circumstances. *Stanton v. Univ. Hosps. Health Sys., Inc.*, 166 Ohio App.3d 758, 2006-Ohio-2297 (8th Dist.).

guilty plea was a nullity and, therefore, R.C. 2743.48(A)(2) did not bar recovery. *Id.* at ¶ 6. The court of appeals affirmed.

{¶ 24} On appeal to the Supreme Court of Ohio, the State argued that the plain language of subsection (A)(2) mandates that the claimant "did not plead guilty," and that Dunbar was seeking "a judicially crafted exception" for claimant's whose guilty pleas have been vacated. *Id.* at 12. The State insisted that "[s]uch an exception would swallow the rule." *Id.* Dunbar countered that R.C. 2743.48 is a remedial statute which must be liberally construed, and that the State's interpretation was "contrary to the clear intent" of the General Assembly. *Id.* Dunbar also argued that R.C. 2743.48(A)(2) was "ambiguous because it does not address the effect of a void or vacated guilty plea." *Id.* at ¶ 13.

{¶ 25} The Supreme Court of Ohio reversed the judgment of the court of appeals stating:

> The General Assembly created the claim for wrongful imprisonment and placed limitations upon the categories of persons who are eligible for compensation. One limitation is that the claimant cannot have pled guilty to the offense.

*Id.* at ¶ 20.

> [W]e must apply the statute as it is written. Here, the statute expressly provides that to demonstrate that he is a "wrongfully imprisoned individual" pursuant to R.C. 2743.48, the claimant must satisfy *each* of the provisions of R.C. 2743.48(A)(1) through (5). *Gover v. State*, 67 Ohio St.3d 93, 95, 616 N.E.2d 207 (1993). This includes the express requirement that the claimant did not plead guilty to the particular offense.

(Emphasis sic.) *Id.* at ¶ 17.

{¶ 26} We must also apply R.C. 2743.48(A)(4) as it is written. The statute expressly requires the claimant to prove that no criminal proceedings can or will be brought against her for any act associated with her prior conviction. The use of the phrase "no criminal proceedings * * * can * * * or will be brought" was clearly intended by the General Assembly to bar recovery to a claimant against whom criminal proceedings are still factually supportable and legally permissible following reversal. The plain language of the statute contains no qualifications and permits no exceptions.

{¶ 27} In this case, reversal of appellant's conviction forecloses the State from using the testimony of the same toxicologist in any future criminal proceedings. However, the physical evidence upon which the State relied in obtaining a conviction is still available for use by the State in any future criminal proceedings. While Oswalt admitted that the few remaining biological samples are not of sufficient quality to permit scientific analysis at this point in time, he is preserving the evidence in the event of a relevant advancement in the science of toxicology in the near future. Moreover, Oswalt has stated that the statute of limitations has not yet run on the charge of attempted aggravated murder and that the existing evidence supports such a charge. Thus, in the context of this case, the State has conclusively demonstrated that appellant cannot prove a critical element of her claim.

{¶ 28} Appellant next contends that the trial court's interpretation of the phrase "no criminal proceedings * * * can * * * be brought" renders meaningless the proceeding language "or will be brought." R.C. 2743.48(A)(4). We disagree.

{¶ 29} In determining the meaning of a statute, a court may not take out, strike or read anything out of a statute, or delete, subtract or omit anything therefrom. *Id.* at ¶ 18. "To the contrary, it is a cardinal rule of statutory construction that significance and effect should if possible be accorded every word, phrase, sentence and part of an act." *Id.* We read the phrase "no criminal proceedings * * * will be brought" as an alternative means for the claimant to satisfy R.C. 2743.48(A)(4) in cases where future criminal proceedings are both factually supportable and legally permissible, but the prosecutor has elected not to proceed. Indeed, "[t]he decision whether to prosecute a criminal offense is generally within the prosecutor's discretion." *Cleveland v. Thorne*, 8th Dist. No. 98365, 2013-Ohio-1029, ¶ 26, citing *United States v. Armstrong,* 517 U.S. 456, 464 (1996). And, "[t]here is * * * a 'strong presumption of regularity' in prosecutorial discretion." *Id.*, quoting *State v. Norris,* 147 Ohio App.3d 224, 229 (8th Dist.2002). When the language of the statute is viewed in the proper light, it is evident that the trial court's interpretation gives meaning to every word, phrase and part of subsection (A)(4).

{¶ 30} In a related argument, appellant contends that the trial court erred when it ignored evidence of her innocence in its subsection (A)(4) analysis. In opposition to the State's motion for summary judgment, appellant submitted her own affidavit wherein she

avers that her husband's death was a suicide. According to appellant, if the trial court accepts her proof of innocence, then, ipso facto, there is an issue of fact whether criminal proceedings can be brought against her for her husband's death.

{¶ 31} Appellant's argument puts the cart before the horse. In our view, an important reason the General Assembly enacted subsection (A)(4) as an element of a wrongful imprisonment claim is to assure that all criminal proceedings that can or will be filed against the claimant are finally determined before a wrongful imprisonment action is commenced. If we were to adopt appellant's position, subsection (A)(4) would be swallowed up by the actual innocence standard in subsection (A)(5). This is the type of argument the Supreme Court rejected in *Dunbar.*

{¶ 32} Finally, to the extent that appellant claims that the trial court's interpretation of subsection (A)(4) distorts the burden of proof in a wrongful imprisonment case, we note that the trial court specifically stated that appellant had the burden of proving each of the elements of her wrongful imprisonment claim, by a preponderance of the evidence. (Trial Court Decision, 7.) Moreover, as noted above, the evidence appellant presented in support of her claim of innocence is not legally sufficient to withstand the State's properly supported motion for summary judgment as to subsection (A)(4).

{¶ 33} In short, appellant was unable to present evidence to support an inference that, more likely than not, no criminal proceeding can or will be brought against her for an act associated with her conviction. We acknowledge that our opinion in *Hill v. State*, 10th Dist. No. 12AP-635, 2013-Ohio-1968, contains dicta suggesting that it is unfair to require a wrongful imprisonment claimant to prove that a prosecutor will never initiate future criminal proceedings. However, the *Hill* case is distinguishable inasmuch as the reviewing court excluded material physical evidence in reversing Hill's conviction, and the prosecutor subsequently acknowledged that no further proceedings would be brought against claimant. *Id.* at ¶ 3. Moreover, the more recent opinion of the Supreme Court in *Dunbar* has cautioned us that creating an exception to the requirements of R.C. 2743.48(A) is "within the purview of the General Assembly." *Id.* at ¶ 19.

{¶ 34} Accordingly, appellant's first assignment of error is overruled.

## D. Motion for Leave

{¶ 35} In her second assignment of error, appellant argues that the trial court abused its discretion when it impliedly denied her motion for leave to file a motion for partial summary judgment. According to appellant, the motion for leave was based upon the recent authority in *Johnston v. State*, Franklin C.P. No. 11CVH-12-15900 (Oct. 31, 2012).[3] In that case, the trial court determined that the reversal of a criminal conviction due to a *Brady* violation[4] constitutes an "error in procedure" as the term is used under amended R.C. 2743.48(A)(5).[5]

{¶ 36} A trial court's decision to grant or deny leave to file a motion for summary judgment is reviewed under the abuse of discretion standard. *Gilchrist v. Gonsor,* 8th Dist. No. 88609, 2007-Ohio-3903, ¶ 30; *Cooper v. Valvoline Instant Oil Change,* 10th Dist. No. 07AP-392, 2007-Ohio-5930, ¶ 8. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 37} Appellant's complaint alleges only that she is wrongfully imprisoned under the actual innocence standard. Rather than moving the trial court to amend her pleading, she sought leave from the trial court to file a motion for summary judgment based upon the "error in procedure" standard. While the trial court did not expressly rule upon the motion for leave, the court did state that appellant's "later arguments regarding subsection (A)(5) are moot." (Nov. 12. 2012 Trial Court Decision, 11.)

{¶ 38} Appellant acknowledges that she failed to timely file her motion for summary judgment. Moreover, to survive the State's motion for summary judgment, appellant was required to produce evidence as to each of the elements of her statutory claim, including R.C. 2743.48(A)(4). Having determined that that the trial court did not err when it granted summary judgment on the basis that appellant failed to present

---

[3] The case is currently before this court on appeal. *See Johnston v. State*, 10th Dist. No. 12AP-1022

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

[5] In December 2002, the General Assembly enacted Sub.S.B. No. 149. As a result of the statutory amendment, a claimant may satisfy R.C. 2743.48(A)(5) by proving that "an error in procedure resulted in the individual's release."

evidence in satisfaction of subsection (A)(4), her "error in procedure" claim is moot. Accordingly, the trial court did not abuse its discretion in denying appellant's motion for leave. Appellant's second assignment of error is overruled.

## IV. DISPOSITION

{¶ 39} Having overruled each of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and SADLER , JJ., concur.

_____